TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN




NO. 03-03-00109-CR




Michael Scott, Appellant

v.

The State of Texas, Appellee





FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT
NO. 996378, HONORABLE MICHAEL LYNCH, JUDGE PRESIDING




O P I N I O N
 
A jury convicted appellant Michael Scott of capital murder. See Tex. Pen. Code Ann.
§ 19.03(a)(2) (West Supp. 2004-05). The district court sentenced him to life imprisonment after the
jury found that there was not a probability that he would commit criminal acts of violence that would
constitute a continuing threat to society. See Tex. Code Crim. Proc. Ann. art. 37.071, § 2(b)(1)
(West Supp. 2004-05).



Scott brings forward three points of error challenging the sufficiency of the evidence
to sustain the guilty verdict. In five points of error, he contends the court erred by admitting in
evidence statements that he and another party to the offense made to the police. Scott’s remaining
points of error assert that the court erred by admitting irrelevant and unfairly prejudicial evidence
offered by the State, excluding expert testimony offered by the defense, and failing to instruct the
jury on the law of accomplice witness testimony. We sustain Scott’s contention that the admission
of the other party’s statement violated his Sixth Amendment confrontation right, but we overrule all
of his remaining points of error. Because we determine beyond a reasonable doubt that the Sixth
Amendment error did not contribute to the conviction, we affirm the district court’s judgment.
 
Background
The Yogurt Shop Murders
On Friday, December 6, 1991, the owner of a party-supply store in a northwest Austin
strip mall was working late when he heard sounds that seemed to come from the roof, followed by
popping noises. He looked outside and saw smoke coming from the front of the frozen yogurt shop
next door to his store. Smoke was also entering his store, so he opened the back door for ventilation. 
He noticed that the back door of the yogurt shop was partially open, and he could see flames inside. 
At that moment, a police officer drove into the alley behind the stores, saw the fire, and reported it. 
The time was 11:47 p.m.
The first firefighters to arrive at the yogurt shop found the front door locked, but they
were able to open it with little difficulty. The shop was dark and full of smoke. The firefighters
began to extinguish the blaze, which was worst in the rear of the shop. As they worked their way
to the back of the building, they discovered four bodies later identified as those of seventeen-year-old
Eliza Thomas, an employee of the yogurt shop; Thomas’s coworker Jennifer Harbison, who was also
seventeen; Jennifer’s fifteen-year-old sister, Sarah Harbison; and Sarah’s thirteen-year-old friend,
Amy Ayers. Amy was planning to spend the night with Sarah, and the two younger girls had walked
to the yogurt shop from Northcross Mall, a nearby shopping mall, to wait for a ride home with
Jennifer.
The space occupied by the yogurt shop was deep and narrow. The front two-thirds
of the space was the public area, with tables and a counter on which the cash register was located. 
On the night in question, the chairs had been stacked on the tables as part of the closing routine. 
Behind the counter was a wall with a door on the right-hand side that opened into the rear third of
the shop. A person walking through this door entered a preparation area with a sink and table; the
cash register drawer was found on this table. On the right wall of this area were the bathrooms; on
the opposite wall was a walk-in cooler. Behind the cooler, in the left rear corner of the shop, was
a storage area with shelves full of paper goods and cleaning materials. In the right rear corner was
the shop’s office, the door of which was closed.
Amy Ayers’s body was found on the floor of the preparation area. She had a ligature
around her neck and it was determined at autopsy that she had been manually strangled, but not
fatally. She also had a bruise on her lower lip. She was naked, and a blouse tied into a knot was
found beneath her body. Ayers had two contact gunshot wounds, one on the top left side of her head
and the other behind her left ear. The first of these was caused by a .22-caliber bullet which did not
penetrate the skull; the medical examiner testified that this shot was not fatal. The second, fatal
gunshot wound was caused by a .380-caliber bullet that passed through the brain and exited through
Ayers’s right cheek.
The other three bodies were found on the floor of the storage area, covered with
rubble from the fire. Eliza Thomas’s body was lying on top of Sarah Harbison’s body, and Jennifer
Harbison’s body was lying beside them. They, too, were naked. The evidence suggests that the three
bodies had been stacked, and that Jennifer’s body had rolled off the pile during the fire. All three
bodies were badly burned and charred, with Jennifer’s having been most severely damaged. 
Thomas’s hands were tied behind her with a brassiere and she had a gag in her mouth. Sarah
Harbison’s hands were tied behind her with panties and she also had been gagged. There was
physical evidence that she had been vaginally assaulted, probably with the handle of the ice cream
scoop found on the floor between her legs. Jennifer Harbison’s hands were behind her back as if
they had been tied, but no binding was recovered. She had a ligature around her neck. Each of these
girls had been killed by a single .22-caliber contact gunshot to the back of the head. 
Four .22-caliber bullets were recovered from the bodies during autopsy. Due to the
condition of the bullets, it was not possible to determine if all four had been fired from the same
weapon. A .380-caliber bullet and a .380-caliber shell casing were recovered at the scene of the
murders. The unusual rifling pattern on the .380 bullet led a firearms expert to conclude that it was
fired from an AMT Backup, a small silver-gray semiautomatic pistol. The murder weapons were
never found.
Melvin Stahl, an arson investigator for the Austin Fire Department, initially
concluded that the fire at the yogurt shop had been started on the shelves in the storage area and then
had spread up the wall, across the ceiling, and down the opposite wall. Under this theory, the bodies
had been burned primarily by radiant heat. Marshall Littleton, a special agent with the Bureau of
Alcohol, Tobacco, and Firearms, reviewed the photographic evidence in October 1999. Based on
his analysis of the burn patterns, the damage to the bodies, and the relative amount of damage to
other items in the area, Littleton concluded that the fire had begun on the bodies, in the center of the
storage area. Stahl testified that after reviewing Littleton’s findings and the evidence on which it was
based, he agreed with the conclusion that the fire began on the bodies.
The manager of the yogurt shop described the store’s closing routine. One of the girls
would first lock the front door, leaving the key in the double-cylinder dead-bolt lock so it would not
be misplaced, then stack the chairs and sweep and mop the front service area. Meanwhile, the other
girl would take the cash register drawer to the table in the preparation area, count the money and
prepare a printed report, then drop the money into a combination safe in the floor. After that, the
various food products would be placed in the cooler, and the yogurt machines, serving implements,
and storage vessels would be washed. The girls would leave through the front door, relock it, and
slide the key under the door in an envelope. After the fire, the key was found still in the front door
lock.
The manager testified that the back door of the shop had a dead-bolt lock with a
thumb latch on the inside. The manager had the only key to the back door, which ordinarily
remained closed and locked. As previously noted, the back door was open on the night of the
offenses.
 
Scott’s Statements
Scott was seventeen years old at the time of the murders and shared an apartment with
Robert Springsteen, who was also seventeen. Scott and Springsteen were first interviewed by the
police in connection with the yogurt shop murders on December 15, 1991. The day before, their
friends Maurice Pierce, aged sixteen, and Forrest Welborn, aged fifteen, had been arrested in
Northcross Mall after Pierce was seen carrying a loaded .22-caliber revolver.


 Scott and his friends
denied any involvement in the murders. The police, who were overrun with leads regarding the
yogurt shop murders, did not pursue this line of inquiry. 
In 1998, Austin police detective Paul Johnson organized a task force to reexamine
the evidence in the yogurt shop case. One of the leads he decided to reopen was the “Pierce tip.” 
In February of that year, Johnson spoke to Scott, now married and living in Austin, by telephone. 
Scott gave Johnson a brief, innocent account of his activities on the night of the murders. In
September 1999, Johnson assigned Sergeant Ronald Lara to conduct a follow-up interview.
Lara called Scott, who agreed to meet him on September 9, 1999, to give a statement. 
At 8:30 a.m. that day, Lara and Detective John Hardesty met Scott in the parking lot of Scott’s wife’s
employer. They drove Scott to police headquarters where, at 9:10 a.m., he was taken to a homicide
interview room equipped with a hidden videotape camera. Lara testified that he had intended to
“spend maybe an hour or two with [Scott] to obtain the information that he had relevant to the
Maurice Pierce tip and to move on.” The officers soon realized, however, that “things were just not
going as normal in the witness interview.” They sensed that Scott was “deceiving, was kind of
holding back on us.” They decided to “go in there and continue talking, questioning him about
things that he knew.”
During the course of the day, Scott was questioned by Lara, Hardesty, and Detective
Robert Merrill.


 Scott told the officers in broad terms that he, Springsteen, Pierce, and Welborn had
gone to the yogurt shop to commit a robbery, murdered the four girls, and set the fire to hide their
tracks. At 8:00 p.m., Scott asked to be taken to the yogurt shop location. Merrill drove him there,
accompanied by several other officers. They returned to the police station at about 9:30, where Scott
was questioned by Merrill in the interview room for about one more hour before being driven home
by Lara.
Scott was questioned further at the homicide office on September 10 and 12. He also
spent the morning of September 12 driving around the western portion of Austin with Lara and
Detective Manuel Fuentes in an unsuccessful attempt to find a bridge where Scott said he and his
friends had gone after the murders. Later that afternoon, Lara drove Scott to a dry creek bed near
the apartment he had shared with Springsteen to look for a pistol. On September 13, Scott invited
Lara and Fuentes to his house, where he answered their questions for about an hour. On September
14, Scott gave an eight-page written statement to Fuentes and Ranger Sal Abreo.
Scott’s written statement was admitted in evidence. Also admitted and played for the
jury were videotapes of the eighteen hours of questioning in the homicide interview room on
September 9, 10, and 12. The jury also heard audio recordings of Scott’s in-car conversations with
Lara on the mornings of September 10 and 12, as the officer was driving him to the police station,
and of the questioning at Scott’s house on the night of September 13. Finally, the jury heard
testimony from police officers regarding statements Scott made at the scene of the crimes and
elsewhere that were not recorded. In Scott’s various statements, he told the police:
 
•  Scott, Springsteen, Pierce, and Welborn were at the food court in Northcross Mall
on the night of December 6, 1991. Pierce mentioned that he needed money and
suggested committing a robbery. The young men left the mall and began to drive
around the neighborhood in Pierce’s car. It was decided that the yogurt shop
would be a likely location for the robbery.
 
•  They parked outside the yogurt shop and Scott, Springsteen, and Pierce went
inside. Pierce placed an order while Scott and Springsteen went to the rear of the
shop on the pretext of using the rest room. Scott and Springsteen opened the back
door and walked out, leaving the door slightly ajar.
 
•  Scott and his companions left the yogurt shop and returned to Northcross Mall to
wait for the stores to close. Then they returned to the strip mall and parked in the
alley behind the yogurt shop. Pierce was armed with a black .22-caliber revolver. 
Springsteen had a small semiautomatic pistol that Scott believed was a .38. 
Pierce, Springsteen, and Scott entered the shop through the back door, leaving
Welborn in the car to act as lookout.
 
•  They were surprised to find four girls inside the yogurt shop. Springsteen told
Scott to check the front door to make sure it was locked. Scott found the door to
be locked and noticed the key. He looked outside to see if anyone was nearby. He
heard Pierce demanding to know where the money was and one of the girls telling
him, “It’s already been dropped and you can’t get to it.” He also heard “somebody
get slapped.”
 
•  Springsteen asked Scott to come help him. Scott returned to the rear of the shop
where he found Springsteen removing the girls’ clothes. Scott began to tie the
girls’ hands with items of clothing; he remembered using a tee shirt and a
brassiere. The girls were crying and begging not to be killed. Scott began to gag
them, using what he remembered as “white like terry cloth.”
 
•  Scott returned to the front of the shop. He heard Pierce shout, “Where the fuck
is the rest of the money.” This was followed by a gunshot. Scott went to the back
of the shop to see what had happened and found one of the girls dead. Pierce
repeated his demand for money to a second girl, then there was a second gunshot.
 
•  Meanwhile, Springsteen was raping one of the other girls. Scott told him “that’s
not what he came here for.” Springsteen stood up and told Scott to “do one of the
girls.” Scott was afraid of Springsteen but unable to get an erection, so he
pretended to have sex with the girl. Pierce then handed Scott the revolver and told
him to “finish her.” Springsteen told Scott to “do it or I would be next.” Scott
pointed the gun at the back of the girl’s head and fired.
 
•  Pierce was now in “the other room” where the safe was located. The fourth girl
was with him. Pierce told Scott, “You’re in this neck deep already.” Springsteen
told Scott “not to be a puss.” Scott, who was still holding the revolver, then shot
the fourth girl in the back of the head. Scott identified a photograph of Amy Ayers
as one of the girls he shot, and he said that she was still alive after he shot her. 
Scott said that Springsteen “shot one of the other girls again because she was still
alive.”
 
•  Springsteen told Scott to “burn the place.” Scott “saw the girls lying there and I
pulled one of the girls on top of the other.” He gathered up napkins, cups, and
paper towels and “piled them on top of the three girls.” Scott sprayed the girls
with lighter fluid he had brought from the car and lit the fire.
 
•  Scott recalled being in the yogurt shop for about twenty minutes. Welborn was
not in the car when Scott, Springsteen, and Pierce left the shop. As they drove
away, they found Welborn in the parking lot. They drove for about ten minutes,
then stopped at a bridge. Scott vomited over the railing of the bridge. He also
threw away a knife he had taken from the yogurt shop.
 
•  That weekend, Scott, Springsteen, Pierce, and Welborn drove to Helotes in a
sport-utility vehicle Pierce had stolen. The purpose of the trip was to visit a girl
Scott had met at a summer music camp. They stopped at a store on the way and
someone bought a newspaper. Scott read aloud the account of the murders and
fire.
 
•  Several days after the murders, Springsteen told Scott that Pierce had been
arrested carrying the .22 revolver. Springsteen still had the .38 semiautomatic
pistol. Scott took the pistol and buried it in the dry creek bed behind the
apartment complex. A year later, he returned to the creek bed, retrieved the pistol,
and gave it to a friend to dispose of. 
 
 
Springsteen’s Statement
Detective Merrill flew to Charleston, West Virginia, on September 14, 1999, to
interview Springsteen. Springsteen agreed to speak to the officer at the police station the following
day. The questioning lasted about five hours and was videotaped. In the course of the statement,
Springsteen confessed to committing the yogurt shop murders with Scott, Pierce, and Welborn. The
complete videotaped statement was introduced in evidence for record purposes only. Merrill read
the following edited summary of Springsteen’s statement to the jury:
 
He said as we talked to him—he originally said that he did not know about
the murders, did not even know they had occurred until he had been interviewed by
the police.
 
As the interview continued, he remembered he bought a newspaper and read
it in a stolen Pathfinder on the way to San Antonio. During the interview, Robert
Springsteen admitted involvement in the murders by telling us that he went into the
yogurt shop prior to the robbery and opened the back door so he had a way to get in.
 
Robert Springsteen said he went through the front door, then went to the
bathroom. Robert Springsteen said when no one was looking he unlocked and
opened the back door. Robert Springsteen said he propped it open by using a folded
pack of cigarettes or a rock to keep the door from shutting all the way, saying it
wasn’t noticeable unless you were looking right at it. Robert Springsteen said at
some point in time he went back that evening. He said he went through the back
door.
 
Robert Springsteen said there was a silver .380 automatic handgun used in the
yogurt shop. Robert Springsteen said he raped a girl; stated he did not think he
ejaculated. He said he shot a girl in the back of the head with the .380 as she was
crawling, screaming, and crying. He demonstrated the position that Amy Ayers died,
which was the position we found her in after the fire was extinguished.
 
Robert Springsteen talked about hearing a total of five shots, maybe six, but
remembered five. And after the robbery, Robert Springsteen said he left the yogurt
shop, went to a bridge where he got out of the car and threw up. Then he ended the
interview before we were complete.
 
Other Testimony
Dearl Croft, owner of a private security company, parked his marked vehicle in front
of the yogurt shop at around 10:00 p.m. on the night of the murders. When he went inside the shop,
a teenaged male asked him if he was a police officer. When it was his turn to order, the young man
refused to go to the counter and asked to use the rest room. Croft was in the shop for about twenty
minutes and did not recall seeing this individual return. Eliza Thomas’s mother, Maria Thomas, was
visiting her daughter in the shop. She and her daughter were acquainted with Croft, who was a
regular customer. She confirmed Croft’s account, adding that the suspicious-acting young man was
accompanied by another young male. Lucella Jones also recalled seeing two teenaged males at the
yogurt shop that night. One of the them had his hand in a bag and “was playing with something—it
sounded like marbles or something clicking together. And it frightened me.” Jones was shown a
photo spread containing Pierce’s photograph. She said that Pierce’s picture looked most like one
of the persons she saw in the yogurt shop, but she did not make a positive identification. She did not
identify either Scott or Springsteen in other photo spreads.
The manager of an Austin Nissan dealership testified that a Pathfinder was stolen
from the lot on the Saturday or Sunday following the yogurt shop murders. Meredith Skipper
testified that Scott, whom she had met at music camp, came to her home in Helotes in December
1991. He was accompanied by three friends, and they were driving a sports utility vehicle.
Sarah Adair was thirteen at the time of the murder. She testified that she and her
older sister, Amanda, were friends of Scott and acquainted with Springsteen, Pierce, and Welborn. 
Adair was questioned by the police at her school a few weeks after the murders. Scott came to her
house later that day and wanted to know exactly what she had been asked by the police and what she
had told them. Adair remembered seeing Scott with a black revolver in December 1991 or January
1992. Around that same time, she also saw Scott with a “silver, smallish gun.”
Sarah’s sister, Amanda Statham, testified that she visited Scott at his house shortly
after the murders. Welborn was leaving as she arrived, and she heard Scott tell him to “keep his
fucking mouth shut.” On another occasion, Statham asked Scott why the police had been talking to
him. Scott answered “kind of like, yeah, we shot them and raped them and blah, blah, blah. Kind
of like half bragging, half joking, half—I don’t know.” Statham told Scott to “shut the fuck up; it
wasn’t funny.” Statham also told her mother, Nancy Reed, what Scott had said. Reed testified that
she told her daughter that Scott “was just trying to scare her.” 
Chandra Morgan was thirteen years old at the time of the murders. She testified that
she met Pierce at Northcross Mall on the night of December 6, 1991. Pierce was with Welborn and
two young men she did not know; she identified Scott at trial as one of them. At some point, they
all took LSD, then went to the yogurt shop. The group then returned to the mall to play games in the
arcade, where Morgan lost track of the others. Later that night, she saw Pierce, Springsteen, and
Scott in a car outside the mall. They asked her if she had seen Welborn. Just then, Welborn walked
into view from the direction of the yogurt shop. Welborn and Morgan got in the car and they began
driving south from the mall. They were met by several fire trucks traveling north. When Morgan
commented about the fire trucks, “They didn’t respond. I mean, it was actually really quiet and
weird.” They drove to an elementary school playground, where Morgan and Pierce got out of the
car. Morgan noticed the others “doing something in the front around the glove box, and that’s when
I saw the butt of a gun” in Scott’s waistband.
Johnny Holder testified that in November 1991, when he was thirteen years old, he
agreed to sell a .22-caliber revolver to Pierce for $100. Holder delivered the pistol, but Pierce did
not pay. On the night of December 6, 1991, Holder saw Scott and Springsteen at Northcross Mall. 
He told them to tell Pierce that he wanted his money. Holder identified the .22 pistol Pierce had in
his possession when he was arrested on December 14, 1991, as the weapon he sold.
Guy Schumann testified that he saw Pierce with a small chrome semiautomatic pistol
in the summer of 1991. Chris Lavas testified that he saw a revolver in Pierce’s waistband in early
1992.
When being booked into jail following his arrest on October 6, 1999, Scott was asked
a series of routine questions by the booking officer. One of these questions was whether he had ever
considered suicide. The officer testified that Scott answered, “December 6, 1991.”
Scott’s defense was aimed at discrediting his statements to the police. To this end,
defense counsel cross-examined the interrogating officers at length in an effort to demonstrate that
they had led him to falsely confess through the misuse of various interrogation techniques. Scott also
sought through his cross-examination of the State’s witnesses to draw the jury’s attention to the
internal inconsistencies in his statements, and to the fact that some of the details contained in his
statements were contrary to the known physical facts.
Scott also offered the testimony of Robert Shomer, a licensed clinical psychologist
with expertise in the field of memory and perception. Shomer testified that memory is a process of
reconstruction based not only on actual perceptions, but also on inference and suggestion by others:
“We reconstruct based on what we may have seen, what we assume we may have seen, what we
think we may have seen, and in some cases what we want to see.” Shomer testified that, contrary
to statements made to Scott by police officers during his interrogation, memory is not like a video
recorder. Shomer was of the opinion that it is unethical to tell a person, as the officers told Scott,
that everything he has ever seen is recorded somewhere in his brain and can be retrieved by merely
“unblocking” the memory. Shomer testified, “[I]f you adopt that theory of memory and somebody
really believes it works that way . . . , then there is nothing really to guard against the creation of
material based on inference and assumption.” Shomer was also critical of “visualization,” another
technique used by Scott’s interrogators. Shomer testified that visualization is “really imagination.” 
He added, “When you ask somebody to put themselves in a particular place, although it may bring
back some of the emotions involved in a situation, or it may create emotions on the spot, it’s
absolutely no guide to accurate memory. . . . [I]f you’re interested in what really occurred, you don’t
want them to imagine anything, because you are asking them to create information, and that
information becomes, through source confusion, mixed with whatever they may have seen.”
 
Sufficiency of Evidence
The jury found that Scott, acting alone or as a party, intentionally murdered Amy
Ayers while in the course of committing or attempting to commit robbery or burglary. See Tex. Pen.
Code Ann. § 19.03(a)(2). Scott contends the evidence is legally and factually insufficient to sustain
the jury’s verdict.
When there is a challenge to the sufficiency of the evidence to sustain a criminal
conviction, the question presented is whether a rational trier of fact could have found the essential
elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324 (1979)
(legal sufficiency); Griffin v. State, 614 S.W.2d 155, 158-59 (Tex. Crim. App. 1981) (legal
sufficiency); Zuniga v. State, 144 S.W.3d 477, 484 (Tex. Crim. App. 2004) (factual sufficiency). 
In a legal sufficiency review, all the evidence is reviewed in the light most favorable to the verdict;
it is assumed that the trier of fact resolved conflicts in the testimony, weighed the evidence, and drew
reasonable inferences in a manner that supports the verdict. Griffin, 614 S.W.2d at 159 (citing
Jackson, 443 U.S. at 318-19). In a factual sufficiency review, all the evidence is considered equally,
including the testimony of defense witnesses and the existence of alternative hypotheses. Orona v.
State, 836 S.W.2d 319, 321 (Tex. App.—Austin 1992, no pet.). Although due deference still must
be accorded the fact finder’s determinations, particularly those concerning the weight and credibility
of the evidence, the reviewing court may disagree with the result in order to prevent a manifest
injustice. Johnson v. State, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000). The evidence will be deemed
factually insufficient to sustain the conviction if the evidence of guilt, considered alone, is too weak
to support a finding of guilt beyond a reasonable doubt, or if the strength of the contrary evidence
precludes a finding of guilt beyond a reasonable doubt. Zuniga, 144 S.W.3d at 484-85.
The State’s case rested primarily on Scott’s statements to the police. Scott attacks
the credibility of these statements, arguing in effect that they were the product of overbearing police
interrogation. Scott points out that during his videotaped questioning, his description of the murders
and the surrounding circumstances constantly evolved as he allegedly sought to please his
interrogators. Scott notes that he never accurately described the inside of the yogurt shop, first
leaving out a wall and then adding a hallway. He first said that the victims were clothed, then said
that they were partially naked, then fully naked. He said that the girls’ hands were tied with an
electric extension cord, then with napkins, then with shirts, or jeans, or undergarments. Scott
variously suggested that the girls had been strangled, bludgeoned, kicked, knifed, and shot. Scott’s
statements did not clearly indicate who shot whom, or with what weapon. Scott inaccurately stated
that one of the girls had been killed behind the shop counter.
There is also evidence that, on one occasion, the interrogation was contaminated
when an officer suggested a critical fact. During the first day of interrogation, one of the officers
asked Scott, “So one of the girls, you’re saying, was shot twice?” In fact, Scott had said nothing
about this up to that time, but he soon confirmed this fact for the officers.
Scott also challenges the credibility of his written statement. He notes several factual
inaccuracies and inconsistencies in the statement. For example, he did not accurately describe the
color of Pierce’s car. He incorrectly stated that he could see the front of the yogurt shop from the
back door, and that one of the girls was killed in the office. The statement is internally inconsistent
with respect to whether Pierce or Springsteen handed Scott a pistol, and whether the pistol used by
Scott was the .22 revolver or the .380 semiautomatic.
The errors and omissions in Scott’s statements must be considered in light of the
totality of the circumstances. Scott’s own expert witness on memory, Robert Shomer, testified that
a person in a highly emotional situation will have a narrower focus and therefore remember the event
with less accuracy. He also testified that the use of drugs can adversely affect memory, and that
memories can degrade or become distorted with the passage of time. Scott told the police that he
had been smoking marihuana and drinking on the day of the murders, and there is evidence that Scott
had taken LSD. Add to this the chaotic scene inside the yogurt shop, and it is unsurprising that Scott,
eight years later, would not recall these events with perfect clarity. It is also possible that some of
Scott’s apparent inability to remember these events accurately was a conscious attempt by him to
deny or minimize his guilt.
It must also be considered that Scott’s statements contained many accurate details. 
He knew that the front door of the yogurt shop was locked and that the key had been left in the lock. 
He also knew that the killers had entered the shop through the back door, which had been left open. 
Scott recalled hearing one of the girls tell Pierce that the money had been “dropped,” that is, placed
in the drop safe as described by the manager. He also described hearing someone slap one of the
girls; this was consistent with the autopsy finding of a contusion on Amy Ayers’s lower lip. Scott
knew that a .22 revolver and a .380 semiautomatic were used in the murders, and he knew that five
shots were fired. Although Scott said one of the girls had been killed in the office, he also said that
she had been by the shop’s safe, which in fact is where Ayers’s body was found. Scott also told the
police that Ayers was still alive after he shot her, a fact consistent with the autopsy findings.
Most tellingly, Scott described piling the bodies of three girls together in the middle
of the storage area, covering them with flammable material, and setting them on fire. This accurate
description of the origin of the fire could not have been the result of police suggestion because, at
the time Scott was being questioned, it was believed that the killers had started the fire in the shelves
along the wall. It was only after Scott gave his statements that another arson expert reexamined the
evidence and concluded that the fire had begun on the bodies as Scott described.


 Recognizing the
importance of this evidence, Scott’s trial counsel spent hours cross-examining the State’s arson
experts in an effort to discredit their testimony. The defense did not, however, proffer any
contradictory expert testimony.
The jury is the exclusive judge of the credibility of the witnesses and the weight to
give their testimony, and the jury may accept or reject all or any part of the evidence. Tex. Code
Crim. Proc. Ann. art. 38.04 (West 1979); see Bonham v. State, 680 S.W.2d 815, 819 (Tex. Crim.
App. 1984); Castellano v. State, 810 S.W.2d 800, 807 (Tex. App.—Austin 1991, no pet.). The jury
in this cause saw all eighteen hours of Scott’s videotaped questioning, heard several more hours of
audiotaped questioning, and had the benefit of expert testimony on memory. Thus, it was in a
position to assess the credibility of Scott’s statements in light of the interrogation techniques
employed by the police. The jury could rationally conclude that, despite the errors and
inconsistencies in his statements, Scott’s confession of guilt was true.
We hold that when all the evidence is considered in the light most favorable to the
jury’s verdict, a rational trier of fact could find all the essential elements of the charged offense
beyond a reasonable doubt. We further hold that when all the evidence is considered neutrally,
including the errors and inconsistencies in Scott’s statements to the police and the circumstances in
which those statements were made, the jury’s finding of guilt beyond a reasonable doubt was not
manifestly unjust. Points of error one and two are overruled.
Accomplice Witness
Scott contends that Springsteen was an accomplice as a matter of law, that the district
court erroneously failed to instruct the jury on the law of accomplice witness testimony, and that
Springsteen’s statement was not adequately corroborated. See Tex. Code Crim. Proc. Ann. art. 38.14
(West 1979). It is settled, however, that article 38.14 applies only to an accomplice’s in-court
testimony; it does not apply to an accomplice’s out-of-court statements. Paredes v. State, 129
S.W.3d 530, 538 (Tex. Crim. App. 2004); Bingham v. State, 913 S.W.2d 208, 211 (Tex. Crim. App.
1995). Points of error three and eleven are overruled.
 
Admission of Scott’s Statements
Miranda and Article 38.22
Scott contends that the admission in evidence of his oral statements to the police
violated the Fifth Amendment of the United States Constitution and the due course of law provision
of the Texas Constitution because he was not advised of his rights prior to the questioning. See U.S.
Const. amends. V, XIV; Tex. Const. art. I, § 9; Miranda v. Arizona, 384 U.S. 436, 444 (1966); see
also Tex. Code Crim. Proc. Ann. art. 38.22, § 3(a)(2) (West Supp. 2004-05). He also contends that
article 38.22 was violated by the admission of his unrecorded oral statements. See Tex. Code Crim.
Proc. Ann. art. 38.22, § 3(a)(1).
Scott does not separately argue his state constitutional claim, nor does he offer any
argument or authority to suggest that the Texas Constitution offers greater protection than the Fifth
Amendment in this context. Accordingly, we overrule the state constitutional claim, point of error
six. See Heitman v. State, 815 S.W.2d 681, 690 n.23 (Tex. Crim. App. 1991).
The trial court overruled Scott’s motion to suppress his statements in a written order
containing findings of fact and conclusions of law.


 The court concluded, among other things, that
Scott was not in custody when he made the statements and therefore neither Miranda nor article
38.22 was applicable. See Miranda, 384 U.S. at 444 (applying procedural safeguards to custodial
interrogation); Tex. Code Crim. Proc. Ann. art. 38.22, § 3(a) (same). In our review of the trial
court’s ruling, we defer to the court’s factual determinations but review de novo the court’s
application of the law to the facts. Maestas v. State, 987 S.W.2d 59, 62 (Tex. Crim. App. 1999);
Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).
A person is in custody if, under the circumstances, a reasonable person would believe
that his freedom of movement was restrained to the degree associated with a formal arrest. 
Stansbury v. California, 511 U.S. 318, 322 (1994). The custody determination is based entirely on
the objective circumstances of the interrogation, and not on the subjective views harbored by either
the interrogating officers or the person being questioned. Id. at 323. Station house questioning does
not, in itself, constitute custody. Oregon v. Mathiason, 429 U.S. 492, 495 (1977).
The court of criminal appeals has outlined four general situations that may constitute
custody in the absence of a formal arrest: (1) when the suspect is physically deprived of his freedom
of action in any significant way; (2) when a law enforcement officer tells the suspect that he cannot
leave; (3) when law enforcement officers create a situation that would lead a reasonable person to
believe that his freedom of movement has been significantly restricted; and (4) when there is
probable cause to arrest and law enforcement officers do not tell the suspect that he is free to leave. 
Dowthitt v. State, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996). Scott relies on the fourth of these
situations. He argues that he was in custody from the moment when, on the first day of questioning,
he initially admitted his involvement in the yogurt shop murders and thereby gave the police
probable cause to arrest him.
We summarized the circumstances in which Scott’s questioning took place during
our discussion of the evidence. Scott was questioned for approximately twenty hours, but he does
not contend and we are not referred to authority holding that lengthy questioning, in itself,
establishes custody. Although length of questioning was one factor cited by the Dowthitt court to
support its conclusion that the defendant in that case was in custody when he gave his incriminating
statement, see id. at 257, the facts of that case are otherwise distinguishable. Dowthitt’s questioning
began at 9:00 a.m. and continued until well past midnight, his protestations that he was exhausted
and his requests to see his wife were ignored, and, after he admitted being at the scene of the crime,
he was told by a police officer that he was not going home. See id. at 252-54. Scott’s questioning,
on the other hand, took place in multiple sessions over a five-day period. Scott was never frisked
or handcuffed, was allowed to take breaks during the interviews without being guarded, and was
provided ample food and drink.


 Although probable cause to arrest arose early in the questioning,
the officers never suggested by word or deed that Scott was not free to leave. To the contrary, the
officers took Scott home at the conclusion of questioning on September 9, and did so on every
subsequent day on which he was questioned. On September 11, Scott was not questioned at all, but
remained at home.


 Scott was not merely told that he was free to leave after probable cause arose,
he was repeatedly allowed to do so.
The district court’s findings of fact are supported by the record. Based on those
findings, the court correctly concluded that a reasonable person in Scott’s position would not believe
that his freedom of movement was restrained to the degree associated with a formal arrest. Because
Scott was not in custody while being questioned, neither the failure to advise him of his rights nor
the failure to record certain of the statements rendered the statements inadmissible under either the
Fifth Amendment and Miranda, or under article 38.22, section 3. Points of error five and seven are
overruled.
 
Voluntariness
In his eighth point of error, Scott contends that all of his statements to the police, both
oral and written, should have been suppressed because they were involuntarily made. A confession
is involuntary or coerced if the totality of the circumstances demonstrates that the confessor did not
make the decision to confess of his own free will. Green v. State, 934 S.W.2d 92, 99 (Tex. Crim.
App. 1996) (citing Arizona v. Fulminante, 499 U.S. 279, 285-86 (1991)). We determine whether
a confession was voluntary under the due process clause of the Fourteenth Amendment by examining
the totality of the circumstances surrounding its acquisition. Armstrong v. State, 718 S.W.2d 686,
693 (Tex. Crim. App. 1985).
We have already discussed some of the circumstances cited by Scott as supporting
his claim that his confessions were coerced: the questioning was initiated by the police, extended
over the course of several days, took place (for the most part) in a police interview room, and was
not preceded by Miranda warnings. Scott also cites what he considers to be improper interrogation
techniques employed by the officers: misrepresentations regarding the information in the officers’
possession, repetitive and leading questions, verbal attacks that created a sense of fear, expressions
of disbelief, and challenges to the contradictions in his statements.
The officers questioning Scott told him that Springsteen, Pierce, and Welborn had
already revealed his role in the yogurt shop murders. This was not true. Misrepresentations by the
police relating to a suspect’s connection to the crime are not, however, considered likely to render
a confession involuntary. Green, 934 S.W.2d at 100 (citing Holland v. McGinnis, 963 F.2d 1044,
1051 (7th Cir. 1992)). Scott does not refer us to any example of a verbal attack by the officers and,
with one exception discussed below, there is no evidence that he was ever frightened during his
questioning. We have previously mentioned the only leading question cited by Scott: the officer’s
question asking Scott if he had said that one of the girls was shot twice. The officers did repeat
questions, confront Scott with contradictions in his statements, and express their disbelief when Scott
dissembled or claimed a loss of memory, but none of these tactics appears calculated to improperly
overcome Scott’s will.
The most serious incident to take place during Scott’s questioning occurred on the
second day. Officer Merrill testified that he and other officers decided to confront Scott with the .22
revolver Pierce was carrying when he was arrested two weeks after the murders. The officers
believed that the revolver might be the murder weapon and that showing it to Scott might “put him
back in there mentally in that store with that gun in his hand” and “focus that memory on the events
that happened.”


 The incident was captured on videotape. Scott asserts that the tape shows Merrill
pointing the revolver at Scott’s head. Merrill testified and the trial court found, however, that the
gun, which was unloaded, was not pointed at Scott. Instead, the court found that Merrill first handed
the gun to Scott. Then, while holding the weapon in his own hand, Merrill placed his finger at the
back of Scott’s head while asking, “Is that the gun you walked up behind somebody with and shot
in the head? Is that the one?” Our review of the videotape confirms the trial court’s finding.
This tactic did not have the desired result. After being shown the .22 revolver, Scott
claimed that his mind was a blank. A few minutes later, he was given a thirty-minute break in
questioning. When questioning resumed, Scott told Merrill, “You scared the shit out of me.” Merrill
replied, “I meant to scare the shit out of you.” This is the only time during his questioning that Scott
expressed fear. 
While the officer’s conduct was improper, the record supports the trial court’s finding
that the officer did not use the .22 pistol to threaten Scott, and that this incident did not coerce or
terrorize Scott so as to cause him to make statements or submit to questioning against his will. As
the court found, Scott had made many inculpatory statements before the incident with the revolver,
and he thereafter voluntarily returned to the police station for further questioning.
A final circumstance cited by Scott is his use of medication for back pain during
questioning. On September 9, Scott told the officers that he suffered from scoliosis and “my back
knots up really bad.” Scott said he had taken a muscle relaxant the day before. Scott does not refer
us to any other evidence of physical discomfort or drug use during his questioning. There is no basis
in the record for finding that Scott was either in pain or under the influence of drugs during his
questioning by the police.
There is no question that Scott was subjected to hours of intense, vigorous
questioning in a police interview room. The officers conceded that the questioning was exhausting,
both for Scott and for themselves. But Scott was not physically forced to cooperate, was allowed
numerous breaks during questioning, and was returned to his home at the close of each day’s
interview. Scott was not held incommunicado, isolated from his family or friends, or denied
adequate rest or food. Although Scott was not expressly advised of his rights, there is evidence that
he called an attorney from his home on September 13, 1999, but after speaking to the attorney
elected to continue to meet with the officers.


 Scott was waiting for the officers at his residence each
morning, repeatedly expressed his desire to cooperate, and even agreed to speak to officers in his
home. Considering the totality of the circumstances shown in this record, the district court properly
concluded that Scott gave his statements to the police voluntarily. Point of error eight is overruled.
Admission of Springsteen’s Statement
Crawford v. Washington
In point of error four, Scott urges that the admission in evidence of Springsteen’s
statement to the police violated his Sixth Amendment right to confront the witnesses against him. 
U.S. Const. amends. VI, XIV. We review the trial court’s ruling de novo. Muttoni v. State, 25
S.W.3d 300, 304 (Tex. App.—Austin 2000, no pet.).
At the time of Scott’s trial, the application of the Sixth Amendment to an out-of-court
statement offered against the accused was governed by Ohio v. Roberts, 448 U.S. 56 (1980). Under
Roberts, the admission of such a statement did not violate the Confrontation Clause if the statement
fell within a firmly rooted hearsay exception or if it contained such particularized guarantees of
trustworthiness that adversarial testing would be expected to add little to its reliability. Id. at 66.
While this appeal was pending, the United States Supreme Court announced its
opinion in Crawford v. Washington, 541 U.S. 36, 158 L. Ed. 2d 177 (2004). In that case, Crawford
stabbed a man named Lee during an altercation that broke out after Lee allegedly tried to rape
Crawford’s wife. 158 L. Ed. 2d at 184-85. Both Crawford and his wife, who witnessed the incident,
gave statements to the police. In his account, Crawford said that he saw something in Lee’s hand. 
Id. at 185. Crawford’s wife, questioned separately, said she did not remember seeing anything in
Lee’s hand. Id. At Crawford’s trial for assault and attempted murder, his wife’s statement was
admitted to rebut his claim of self-defense after the trial court found that it was reliable under
Roberts. Id. at 186.
In its opinion, the Supreme Court reviewed the Sixth Amendment’s historical
background and reached two conclusions. First, “the principal evil at which the Confrontation
Clause was directed was the civil-law mode of criminal procedure, and particularly its use of ex parte
examinations as evidence against the accused.” Id. at 192. Second, “the Framers would not have
allowed admission of testimonial statements of a witness who did not appear at trial unless he was
unavailable to testify, and the defendant had had a prior opportunity for cross-examination.” Id. at
194. The Court stated that the Roberts “indicia of reliability” standard departed from these principles
in two respects: (1) it was too broad, in that it applied the same mode of analysis whether or not the
hearsay consisted of ex parte testimony; and (2) it was too narrow, in that it admitted statements that
constituted ex parte testimony upon a mere finding of reliability. Id. at 198. The Court added:
 
Where testimonial statements are involved, we do not think the Framers
meant to leave the Sixth Amendment’s protection to the vagaries of the rules of
evidence, much less to amorphous notions of “reliability.” . . . Admitting statements
deemed reliable by a judge is fundamentally at odds with the right of confrontation. 
To be sure, the Clause’s ultimate goal is to ensure reliability of evidence, but it is a
procedural rather than a substantive guarantee. It commands, not that evidence be
reliable, but that reliability be assessed in a particular manner: by testing in the
crucible of cross-examination. The Clause thus reflects a judgment, not only about
the desirability of reliable evidence (a point on which there could be little dissent),
but about how reliability can best be determined.
 
 
Id. at 199. The Court disapproved the continued use of the Roberts reliability test to determine the
admissibility of testimonial hearsay. “Where testimonial evidence is at issue . . . the Sixth
Amendment demands what the common law required: unavailability and a prior opportunity for
cross-examination.” Id. at 203. The Court declined to spell out a comprehensive definition of
“testimonial” but said that “it applies at a minimum to prior testimony at a preliminary hearing,
before a grand jury, or at a former trial; and to police interrogations.” Id. The Court held that
Crawford’s Sixth Amendment confrontation right was violated by the introduction of his wife’s
testimonial statement to the police. Id.
There is no question that Springsteen’s statement was “knowingly given in response
to structured police questioning” and hence the product of police interrogation.


 Id. at 194 n.4. 
Nevertheless, the State argues that Springsteen’s statement was not testimonial under Crawford
because it was not “accusatory.” Noting that the word “accuse” or some variation of it appears over
twenty times in Crawford, the State urges that a declarant must have a motive to accuse and must
actually accuse the defendant of a criminal act for the declarant’s statement to be considered
testimonial. The State claims to find support for this position in the text of the Sixth Amendment,
arguing that the Confrontation Clause does not attach unless the declarant’s statement is used
“against” the accused, which the State equates to an accusation of criminal conduct. Because
Springsteen’s statement to the police had been redacted to omit any reference to Scott, the State
concludes that it was not accusatory and that its introduction in evidence did not make Springsteen
a witness against Scott within the meaning of the Sixth Amendment.
A flaw in the State’s argument is that Crawford’s wife’s statement was not accusatory
within the State’s proposed definition: she did not accuse her husband of a crime and there is no
suggestion that she had intended to do so. Recognizing this, the State argues that the wife’s
statement “was being offered against [Crawford] because it described [Crawford’s] behavior during
the crime and directly contradicted one of [Crawford’s] statements; it was used to disprove the one
fact that could exculpate [Crawford].” But the State used Springsteen’s statement in a similar
manner: to corroborate Scott’s own statements and thus to rebut Scott’s defensive theory that his
confession was the unreliable product of police overreaching. Although Springsteen’s statement had
been redacted to remove any reference to Scott, the State used the statement against Scott just as
surely as the prosecutors used Crawford’s wife’s statement against Crawford.
The State also claims that its reading of Crawford is supported by the opinion in
Williamson v. United States, 512 U.S. 594 (1994). At issue in Williamson was the scope of the
federal hearsay exception for statements against penal interest. Id. at 596; Fed. R. Evid. 804(b)(3);
see Tex. R. Evid. 803(24). The Supreme Court held that the rule authorizes the admission of only
those declarations or remarks within a larger statement that are individually self-inculpatory; the rule
does not permit the introduction of the non-self-inculpatory parts of a statement. Williamson, 512
U.S. at 599. The Court emphasized that while the rule does allow the admission of third-party
statements that inculpate a criminal defendant, such statements, to be admissible, must be truly self-inculpatory and not merely attempts to shift blame or curry favor. Id. at 603. As an example of an
admissible statement against penal interest, the Court posited a statement to the police that, on its
face, inculpates only the speaker, but which, given the circumstances, also inculpates the defendant. 
Id.
The Court in Williamson expressly did not address the defendant’s claim that the
statements at issue were inadmissible under the Confrontation Clause. Id. at 605. We cannot accept
the State’s assertion that Williamson is a Sixth Amendment case and that the examples it uses to
illustrate the proper application of the evidence rule also inform the meaning of “testimonial,” as that
term is used in Crawford. It is true that “hearsay rules and the Confrontation Clause are generally
designed to protect similar values.” California v. Green, 399 U.S. 149, 155 (1970). But “[w]here
testimonial statements are involved, we do not think the Framers meant to leave the Sixth
Amendment’s protection to the vagaries of the rules of evidence.” Crawford, 158 L. Ed. 2d at 199. 
The question of whether a statement is testimonial within the meaning of the Sixth Amendment and
Crawford does not turn on whether it is self-inculpatory within the meaning of the hearsay exception
for statements against penal interest.



Just as Roberts substituted a trial judge’s reliability determination for cross-examination, the State would substitute a trial judge’s determination that the statement was not
accusatory. But the State’s labored effort to define a testimonial statement in terms of what is said
ignores Crawford’s teaching that the Confrontation Clause “is a procedural rather than a substantive
guarantee” that commands that evidence be tested “in the crucible of cross-examination.” Id. The
Supreme Court’s examples of testimonial statements clearly reflect that it is the circumstances in
which the statement is made, not its content, that is determinative. Id. at 203 (term “applies at a
minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and
to police interrogations”).
We believe that Crawford means what it says: statements made during police
interrogations are testimonial, and like other testimonial statements, they are admissible under the
Sixth Amendment only if the declarant is unavailable and the defendant had a prior opportunity to
cross-examine. Id. Springsteen’s statement to the police was no less testimonial because it had been
redacted to remove all references to Scott.


 Because Scott had no prior opportunity to cross-examine, the introduction of Springsteen’s testimonial statement violated Scott’s Sixth Amendment
right to confront the witnesses against him. 
A recent opinion by the Fort Worth Court of Appeals is consistent with our holding
in this cause. See Hale v. State, 139 S.W.3d 418 (Tex. App.—Fort Worth 2004, no pet.). In Hale,
the defendant unsuccessfully moved to suppress his accomplice’s statement to the police on Sixth
Amendment grounds. Id. at 420. The statement had been redacted to delete the defendant’s name,
although references to the defendant’s conduct remained. See id. n.1. Without expressing any
opinion regarding the effect of the redaction, the appellate court held that the statement was
inadmissible under Crawford. Id. at 422.

Harm Analysis
Confrontation Clause violations are subject to harmless error analysis. See Lilly v.
Virginia, 527 U.S. 116, 140 (1999); Harrington v. California, 395 U.S. 250, 254 (1969). If an
appellate court finds constitutional error subject to harmless error review, it must reverse unless it
determines beyond a reasonable doubt that the error did not contribute to the conviction or
punishment. Tex. R. App. P. 44.2(a) (incorporating holding in Chapman v. California, 386 U.S. 18,
24 (1967)). If there is a reasonable likelihood that an error materially affected the jury’s
deliberations, then the error was not harmless beyond a reasonable doubt. Wesbrook v. State, 29
S.W.3d 103, 119 (Tex. Crim. App. 2000) (citing Satterwhite v. Texas, 486 U.S. 249 (1988)).
In a harmless error review, the focus is not on the propriety of the outcome of the trial. 
Id.; Harris v. State, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989). Instead, the appellate court
should calculate as much as possible the probable impact of the error on the jury in light of the
existence of other evidence. Wesbrook, 29 S.W.3d at 119; Harris, 790 S.W.2d at 587. Thus, the
court should examine the source of the error, the nature of the error, and the extent to which it was
emphasized by the State. Harris, 790 S.W.2d at 587. The court should also determine whether
declaring the error harmless would encourage the State to repeat it with impunity. Id.
Because there was no physical evidence linking Scott to the yogurt shop murders, the
question of his guilt or innocence turned on whether the jury believed or disbelieved his statements
to the police. Springsteen’s testimonial statement to the police, edited down to a short, five
paragraph summary describing Springsteen’s conduct on the night of the murders, was offered and
admitted to corroborate Scott’s statements and thus to rebut Scott’s defensive claim that his
statements were unreliable and untrue.
We would not hesitate to reverse this conviction if Springsteen’s statement were the
only corroboration of Scott’s statements to the police. But as we have already discussed with regard
to the sufficiency of the evidence, Scott’s statements contained many details regarding the murders
that were consistent with the physical evidence: he knew that the front door of the yogurt shop was
locked and that the key had been left in the lock; he knew that the killers had entered the shop
through the back door, which had been left open; he heard one of the girls tell Pierce that the money
had been “dropped”; he heard someone slap one of the girls, a fact confirmed by the finding of a
contusion on Amy Ayers’s lower lip; he knew that a .22 revolver and a .380 semiautomatic were
used in the murders, and he knew that five shots were fired; he told the police that Ayers was still
alive after he shot her, a fact consistent with the autopsy findings.
The most critical corroborating fact, and the one most damaging to Scott’s defense,
was his description of how the bodies of three girls were piled together in the middle of the storage
area, covered with flammable material, and set on fire. At the time Scott was being questioned, it
was believed that the fire started in the shelves along the wall of the storage area and that the bodies
were damaged by thermal heat, not direct flame. It was only after Scott gave his statements that
arson experts reexamined the evidence and concluded that the fire began as Scott described. Under
the circumstances, Scott’s accurate description of the fire’s origin could not be the product of
intentional or unintentional police suggestion. And it is very unlikely that it was simply a guess.
Scott’s statements were corroborated in other ways. Scott said that he and his
companions decided to commit a robbery because Pierce needed money, a fact corroborated by
testimony that Pierce owed money for a pistol. A witness saw Scott with a pistol on the night of the
murders and described the odd behavior of Scott and his companions. Other witnesses saw Scott
in possession of handguns around the time of the murders, or heard Scott make incriminating
statements soon after the murders. Scott’s account of the trip to Helotes in the stolen Pathfinder was
corroborated by the testimony of his friend from orchestra camp.
The credibility of Scott’s statements dominated the jury arguments of both the
prosecutors and defense counsel. Springsteen’s statement, however, was not mentioned until the
close of the State’s argument, when one of the prosecutors addressed the similarities between Scott’s
statements and Springsteen’s statement. We quote the argument in full:
 
So Michael Scott gives his confession to police and as [Officer] Chuck Meyer
says, we still have homework to do. So they go to West Virginia and they talk to
Robert Springsteen who has not been in Austin since 1992, early part of 1992. And
the tactics that were employed — sitting in his room silently for 10 or 12 minutes
waiting for him to decide to confess. That’s the tactics you heard about, among
others obviously.
 
Michael Scott’s written statement about the newspaper in the Pathfinder —
I’ll let you read that when you get back in the jury room. But he talks about it. 
Robert Springsteen’s interview. Robert Springsteen remembered he bought a
newspaper and read it in a stolen Pathfinder on the way to San Antonio.
 
We got to go back through the question that led to this response.[


] They just
asked him: Do you remember a Pathfinder? He said, we went to San Antonio and
as a matter of fact bought a newspaper on the way down. Bought it Sunday morning
before 6 a.m. That came from Robert Springsteen without being fed information by
the police. It’s in the record.
 
. . . .
 
Thank you. I’m running out of time, so you know what Michael Scott says
about the restroom, how they went in, opened up the back door, left it ajar so they
could come back. Robert Springsteen in West Virginia, a completely different state,
who hasn’t been talked to by the police en route to the police department, whose
entire confession up there is on videotape, says that they went into the yogurt shop
prior to the robbery, opened up the back door so they had a way to get in.
 
The question that elicited that response was [Officer] Robert Merrill saying:
You just remembered. I saw your head move. Tell me about it.
 
Answer by Mr. Springsteen: At some point in time, came through the back
door, opened up the back door. Says he went through the front door, went to the
bathroom. When no one was looking, he unlocked it and opened the back door, used
a folded pack of cigarettes or rock to keep the door from shutting all the way.
 
Michael Scott’s written statement talks about coming back in through the
back door. Robert Springsteen, same thing in West Virginia the next day. So at
some point in time he went back that evening, came in through the back door.
 
Michael Scott’s written statement about sexual assault. Robert Springsteen’s
interview — that’s okay. We can just leave that one right there.
 
Robert Springsteen’s interview. Michael Scott has described this gun as a
James Bond gun, a small semiautomatic. And you saw one here in court. Very
small, equivalent of a nine millimeter, will fit in the palm of your hand. Michael
Scott calls it a James Bond gun. Robert Springsteen said it’s a silver .380. That
information was a closely guarded fact in this investigation. Robert Springsteen
knows the answer to that question.
 
Said Amy was shot or he described the person he shot as she was crawling,
screaming and crying. Are you going to tell me based on all that information in the
corner over there by the office wall that anybody can say that she didn’t flop around
and she never crawled?
 
Michael Scott’s statement about going to a bridge and throwing up. Robert
Springsteen, same thing in West Virginia. The questions that elicited this response
from Robert Springsteen were: Where did you drive to? He said . . . . There is a
bridge, a little stream over there by the yogurt shop. What did you do? He mentions
that he threw up. These facts are not suggested to him. That, ladies and gentlemen
of the jury, right there is a neutral fact. A neutral fact that only these two people
know.
 
As you wade through the evidence, I have some objective facts for you. I
have some objective facts for you. Michael Scott describing the body positions, two
girls like this. One girl laying on top. Robert Springsteen talking about the girl that
he killed. Those are objective facts. That’s information right there, ladies and
gentlemen, that only the people who committed this offense could know.
 
Stay in there as long as you have to. If somebody decides that they have a
problem with this case, you get them to explain these two pieces of information, and
that piece of information in the middle where they both know about going to a bridge
and throwing up.
 
 
These remarks take up four pages in the record; the State’s argument as a whole is seventy-seven
pages long. It would be impractical to quote all of the argument that dealt with the other
corroborating evidence because, in essence, the State’s entire argument was devoted to that evidence.
The jury watched all eighteen hours of Scott’s videotaped statements, heard several
hours of tape-recorded oral statements, and read Scott’s written statement. By contrast, the jury was
not shown Springsteen’s videotaped statement to the police but heard only the brief, redacted version
that did not mention Scott. While the redaction did not render the statement admissible under
Crawford, we do believe under the circumstances that it served to reduce the harm resulting from
the statement’s erroneous admission. Because of the redaction, Springsteen’s statement did not
expressly implicate Scott as implied by the dissent.
The wealth of accurate physical detail contained in Scott’s statements, Scott’s
knowledge of how and where the fire began, and the testimony describing Scott’s conduct and
statements near the time of the murders overwhelmingly support a finding that Scott’s statements
are true. See Wesbrook, 29 S.W.3d at 119 (overwhelming evidence supporting finding in question
is relevant factor in harmless error analysis). Moreover, the jury was able to assess Scott’s credibility
for itself as it watched the eighteen hours of videotaped police questioning. We are satisfied from
an examination of the record as a whole that there is no reasonable possibility that the admission of
Springsteen’s statement moved the jury from a state of nonpersuasion to one of persuasion with
regard to the credibility of Scott’s confession of guilt. See id. And because the credibility of Scott’s
confession was the crucial issue in this case, we are thus convinced that the erroneous admission of
Springsteen’s statement did not materially affect the jury’s deliberations.
We also note that the error arises out of the change in the law announced by the
Supreme Court in Crawford after Scott’s trial. The record reflects that the trial court, with the full
support of the prosecutors, made every effort to comply with the Roberts standard that was in effect
at the time of trial. We have no reason to believe that the trial court or the State will in the future
be any less dedicated to fully complying with Crawford, and therefore we are confident that
declaring the error harmless will not encourage the State to repeat it with impunity.
We determine beyond a reasonable doubt that the erroneous admission of
Springsteen’s testimonial statement to the police did not contribute to the conviction or punishment. 
Point of error four is overruled.
 
Other State Witnesses
Scott complains of the admission of testimony from seven State witnesses. He urges
that the testimony was either irrelevant, unfairly prejudicial, or improper character-conformity
evidence. The trial court’s decision to admit or exclude evidence is reviewed for an abuse of
discretion. Montgomery v. State, 810 S.W.2d 372, 390 (Tex. Crim. App. 1991) (op. on reh’g).
Evidence is relevant if it has any tendency to make the existence of a fact of
consequence to the determination of the action more or less probable than it would be without the
evidence. Tex. R. Evid. 401. Broadly speaking, all relevant evidence is admissible. Tex. R. Evid.
402. Relevant evidence may be excluded, however, if its probative value is substantially outweighed
by the danger of unfair prejudice. Tex. R. Evid. 403. Evidence is unfairly prejudicial when it has
an undue tendency to suggest that a decision be made on an improper basis, commonly, but not
necessarily, an emotional one. Vasquez v. State, 67 S.W.3d 229, 240 (Tex. Crim. App. 2002). 
Factors that should be considered in applying rule 403 are the probative value of the evidence, the
potential of the evidence to impress the jury in some irrational way, the time needed to develop the
evidence, and the proponent’s need for the evidence. Montgomery, 810 S.W.2d at 389-90. 
Evidence of other crimes, wrongs, or acts is not admissible to prove the defendant’s
character in order to show action in conformity to that character. Tex. R. Evid. 404(b). This rule
incorporates the fundamental tenet of our criminal justice system that an accused may be tried only
for the offense of which he is accused and not for his criminal propensities. Rankin v. State, 974
S.W.2d 707, 718 (Tex. Crim. App. 1996). A defendant may not be tried for some collateral crime
or for being a criminal generally. Williams v. State, 662 S.W.2d 344, 346 (Tex. Crim. App. 1983).
Sarah Adair. Adair testified that she saw Scott with a black revolver and a “silver,
smallish gun” in December 1991 or January 1992. Scott contends this testimony was more
prejudicial than probative because it was not credible. He notes that Adair did not reveal this
information when she was questioned by the police soon after the murders, but only after Scott was
arrested. He also points to the absence of any corroborating evidence and the inconsistency between
Adair’s testimony and other evidence in the case. Scott did not voice a rule 403 objection to Adair’s
testimony about the guns; his only trial objection was that the testimony was irrelevant. See Tex.
R. App. P. 33.1(a) (preservation of error); Tex. R. Evid. 103(a)(1) (same).
Evidence that, at or about the time of the murders, Scott was in possession of
handguns similar to those he described in his statements to the police was clearly relevant. 
Moreover, Adair’s description of a “silver, smallish gun” was consistent with the testimony of a
firearms expert who testified that the .380 bullet recovered at the scene of the murders was fired by
an AMT Backup, a small silver-gray semiautomatic pistol. The trial court did not abuse its
discretion by overruling Scott’s objection to the relevance of Adair’s testimony. Any inconsistencies
between her testimony and that of other witnesses went to the weight of the evidence, not its
admissibility, and was a matter for the jury to resolve. There is no basis in the record for concluding
that Adair’s testimony was unfairly prejudicial, even if that contention had been preserved for
review.
Amanda Statham and Nancy Reed. Statham testified that she visited Scott at his
house shortly after the murders. Welborn was leaving as she arrived, and she heard Scott tell him
to “keep his fucking mouth shut.” On another occasion, Statham asked Scott why the police had
been talking to him. Scott answered “kind of like, yeah, we shot them and raped them and blah,
blah, blah. Kind of like half bragging, half joking, half—I don’t know.” Statham told her mother,
Reed, what Scott had said. Reed testified that she told her daughter that Scott “was just trying to
scare her.”
Scott argues that this testimony was irrelevant or, alternatively, more prejudicial than
probative. Scott did not object to the testimony on either ground, however, and therefore did not
preserve these contentions for review. In any event, Scott’s argument that he may have been
speaking to Welborn about a matter other than the murders goes to the weight of the testimony, not
its admissibility. The same can be said of Scott’s suggestion that he was merely joking with
Statham. We find no abuse of discretion in the admission of Statham’s and Reed’s testimony.
Chandra Morgan. Morgan testified that she was with Pierce, Welborn, and Scott
at Northcross Mall on the night of December 6, 1991. At some point, they took LSD, went to the
yogurt shop, and then returned to the mall to play games in the arcade. Later that night, she saw
Pierce, Springsteen, and Scott in a car outside the mall. They asked her if she had seen Welborn. 
Just then, Welborn walked into view from the direction of the yogurt shop. Welborn and Morgan
got in the car and they began driving south from the mall. When they met several fire trucks
traveling north, Morgan’s companions became very quiet. They drove to an elementary school
playground, where Morgan noticed that Scott had a gun in his waistband.
Scott concedes that Morgan’s testimony was relevant, but he urges that its probative
value was outweighed by the danger of unfair prejudice. Once again, Scott did not voice this
objection at trial. And once again, Scott’s argument reduces to a challenge to the witness’s
credibility, which was a matter for the jury to decide. The trial court would not have abused its
discretion by admitting Morgan’s testimony over a rule 403 objection. 
Johnny Holder. Holder testified that he sold a .22-caliber revolver to Pierce for $100
in November 1991. Scott contends this testimony was irrelevant and unfairly prejudicial because
the evidence shows that the gun Holder sold to Pierce was not the murder weapon. He also urges
that this testimony was “an effort to bad mouth Scott’s friends so as to tar him with the same brush.” 
Scott objected to Holder’s testimony on rule 401 and 403 grounds, but did not voice a rule 404(b)
objection.
Although Pierce was not on trial, he was one of the actors named by Scott in his
statements to the police. Even if the weapon Holder sold to Pierce was not used at the yogurt shop,
his testimony was some evidence of Pierce’s interest in weapons of the sort used to commit the
murders. Holder also testified that Pierce did not pay him when he delivered the pistol, and that he
had demanded payment when he met Scott and Springsteen at Northcross Mall on the night of the
murders. This testimony was relevant in light of Scott’s statement that he and his companions
initially planned a robbery because Pierce was in need of money. The trial court did not abuse its
discretion by ruling that Holder’s testimony was relevant and that its probative value was not
outweighed by the danger of unfair prejudice.
Guy Schumann and Chris Lavas. Schumann testified that he saw Pierce with a
small chrome semiautomatic pistol in the summer of 1991. Lavas testified that he saw a revolver
in Pierce’s waistband in early 1992. Scott argues that this testimony was irrelevant other than to
show the bad character of one of his associates.
Evidence that Pierce was seen at or about the time of the murders in possession of a
revolver and a small semiautomatic pistol had relevance beyond mere character conformity. Like
Holder’s testimony, it showed that Pierce had access to weapons similar to those used to commit the
murders. Lavas’s statement that Pierce threatened him with one of the pistols was made during voir
dire outside the jury’s presence, and this fact was not admitted before the jury after the court
sustained Scott’s rule 404(b) objection. No abuse of discretion is shown.
Finding no abuse of discretion in the admission of the challenged testimony, we
overrule point of error ten.
 
Exclusion of Defense Testimony
Scott contends he was denied his constitutional right to present a defense when the
trial court excluded expert testimony supporting his defensive claim that his statements to the police
were false. Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in
the Compulsory Process or Confrontation clauses of the Sixth Amendment, the United States
Constitution guarantees criminal defendants “a meaningful opportunity to present a complete
defense.” Crane v. Kentucky, 476 U.S. 683, 690 (1986) (quoting California v. Trombetta, 467 U.S.
479, 485 (1984)). This right is violated by the exclusion of competent, reliable evidence bearing on
the credibility of a confession when such evidence is central to the defendant’s claim of innocence. 
Id. The trial court excluded the testimony in question after concluding that it was unreliable and
hence inadmissible under evidence rule 702. Tex. R. Evid. 702; see Kelly v. State, 824 S.W.2d 568,
572 (Tex. Crim. App. 1992). We review the court’s ruling for an abuse of discretion. Kelly, 824
S.W.2d at 574.
Outside the jury’s presence, Scott proffered the testimony of Richard Leo, a professor
of social psychology and criminology at the University of California at Irvine. Leo testified that his
area of expertise was “coercive persuasion or extreme influence in decision-making.” Leo has
studied police interrogation techniques and false confessions, and he has authored or coauthored
numerous articles in professional journals on this subject.


 According to Leo, the psychology of
interrogation and confession is a recognized area of social scientific study.
Leo stated that modern police interrogation “is premised on the notion that the person
is guilty, that they will deny their guilt, and that you need to use psychological techniques to break
down their denials and change their perceptions so that they come to see it as in their self-interest
to make an admission.” Leo described a two-part model for interrogation. First, the interrogators
seek to break down the suspect’s confidence and his ability to deny his guilt. This is accomplished
by isolating the suspect and building a rapport between the suspect and the interrogators, and then
accusing the suspect and attacking his denials as implausible, impossible, or inconsistent with
existing evidence. Second, the interrogators motivate the suspect to believe that it is in his self-interest to confess. To do this, interrogators may appeal to morality, describe a scenario of the crime
in which the suspect is the least culpable actor, or suggest that the suspect will be treated more
harshly by the criminal justice system if he persists in denying his guilt.
Leo testified that modern interrogation techniques are not designed or intended to
produce false confessions but that they can nevertheless lead an innocent person to confess,
particularly if the interrogator relies too heavily on “very high pressure interrogation techniques.” 
Leo posited three types of false confessions: (1) the voluntary false confession, in which an innocent
person comes forward on his own volition and confesses; (2) the compliant false confession, in
which an innocent suspect confesses in order to escape the pressures of interrogation or to receive
some suggested benefit; and (3) the persuaded or internalized false confession, in which an innocent
suspect comes to believe during the course of interrogation that he is guilty but has forgotten his
criminal actions and thereafter makes good faith guesses or inferences about how and why he
committed the crime. According to Leo, the persuaded false confession is the rarest form of false
confession.
Leo said that it is impossible to determine whether a particular confession is true or
false just by looking at the interrogation techniques that produced the confession. Instead, one must
examine the “post-admission narrative,” that portion of the interrogation after the person admits
guilt, to determine whether or not the narrative contains details that the true perpetrator would be
expected to know and that are consistent with the known facts. Leo testified that it is not currently
possible to know how many confessions are false, and he agreed that the great majority of
confessions are true.
At the conclusion of the proffer, the court announced that it would allow most, but
not all, of the proffered testimony. The court’s ruling, which was later reduced to writing, admitted
Leo’s testimony with regard to: (1) the two-step model of modern police interrogation; (2) the intent
of the interrogation process, and how it does and does not work; (3) the interrogation techniques
taught by Reid and Associates, a leading police training firm; (4) the misuse of interrogation
techniques that can cause innocent persons to confess; and (5) the fact that interrogation techniques
can lead to false confessions even when used properly. The court ruled that Leo would not be
allowed to testify with respect to: (1) the post-admission narrative; (2) the types of false confessions,
including persuaded false confessions, and the mental processes through which suspects progress;
and (3) his opinion that any particular interrogation technique is coercive or would render a
confession involuntary. Rather than accept the court’s limitations on Leo’s testimony, the defense
elected not to call him as a witness.
On appeal, Scott complains only of the exclusion of Leo’s testimony regarding
persuaded false confessions. He argues that Leo’s description of how an innocent person can come
to believe that he is guilty and then create a false narrative describing his assumed guilty conduct
mirrors the process, shown in the videotaped interrogation sessions, by which he came to confess
his guilt of the yogurt shop murders. Scott contends that the court’s exclusion of this testimony went
to the very heart of his defense.
A qualified expert may testify regarding scientific, technical, or other specialized
knowledge if the trial court determines that the testimony will assist the trier of fact to understand
the evidence or to determine a fact in issue. Tex. R. Evid. 702. The proponent of scientific or
technical testimony has the burden of demonstrating by clear and convincing evidence that the
proffered testimony is both relevant and reliable. Kelley, 824 S.W.2d at 572-73; see also Daubert
v. Merrell Dow Pharm., Inc., 509 U.S. 579, 590-92 (1993). When determining the reliability of
testimony addressing the social sciences or other fields of study based primarily on experience and
training, the appropriate questions are: (1) whether the field of expertise is a legitimate one; (2)
whether the subject matter of the expert’s testimony is within the scope of that field; and (3) whether
the expert’s testimony properly relies on or utilizes the principles involved in the field. Nenno v.
State, 970 S.W.2d 549, 561 (Tex. Crim. App. 1998). Factors that may affect the trial court’s
determination of reliability include: (1) the extent to which the underlying theory is accepted as valid
by the relevant scientific or technical community; (2) the qualifications, experience, and skill of the
testifying expert; (3) the existence of literature supporting or rejecting the underlying theory; and (4)
the potential rate of error. Kelly, 824 S.W.2d at 573.
In its written order, the district court explained its ruling:
 
While this ruling may appear to be hairsplitting, it was designed in the
Court’s view to maximize the proponent’s arguably legitimate use of the witness
while restricting the witness from inappropriate areas. The limitation excluded areas
where his novel science appears unproven and essentially untested, where he
appeared to be exceeding his true area of expertise or sought to use terms of
significant legal consequence that could confuse or mislead the jury, or where his
testimony would not be of assistance to the trier of fact.
 
When the Court reviewed all material provided by the parties on this issue,
the one clear impression left is that the area of false confessions during police
interrogation is an area of study in its infancy with different views and countervailing
opinions. There is a significant lack of empirical studies and those that exist are not
specifically involved with actual police interrogation or appear not to be objective or
complete.
 
. . . .
 
. . . Leo was allowed to describe the techniques of interrogation and to state
that the innocent do sometimes confess as well as the guilty. The Court’s problem
is with Leo’s willingness to testify that the modern tactics lead ordinary people to
confess during interrogation under normal circumstances and that these folks come
to believe that they are actually guilty and keep these beliefs perhaps for quite some
time. How does he know that? If there are examples of these occurrences, were the
confessors analyzed by psychiatrists or other mental experts to eliminate the
possibility of mental disease or defect? How do we know they were normal? Were
the interrogations videotaped to insure that physical or other coercive tactics were not
used? How often does it occur, if at all? Without this type of significant detailed
analysis, how can an expert state that regular people leave interrogations truly
believing they committed terrible acts when they have done nothing? 
 
 
Both in open court and in its written order, the court cited studies, acknowledged by
Leo during his questioning, criticizing his methodology, stating that the study of false confessions
has yet to produce scientifically reliable conclusions, or making less sweeping judgments regarding
the likelihood of an innocent suspect falsely confessing.


 Leo, who is not a clinician, did not cite
any studies or otherwise explain how he knew or was qualified to state that a person of normal
intelligence and suffering no mental disease or defect could come to believe, during interrogation,
that he is in fact guilty of a crime. Leo had never met Scott and did not suggest that Scott was
particularly susceptible to making a persuaded false confession.
Even if a trial court determines that proffered expert testimony is reliable, it may
decide that, on balance, the testimony would be unhelpful to the trier of fact for one or more of the
reasons identified in evidence rule 403. Kelly, 824 S.W.2d at 572; see Tex. R. Evid. 403. In this
case, the same considerations that led the trial court to doubt the reliability of Leo’s testimony
regarding persuaded false confessions led the court to believe that the probative value of the
testimony was outweighed by the danger of unfair prejudice, confusion of the issues, and delay. The
court also concluded that Leo’s testimony was cumulative of the testimony of Scott’s memory
expert, Robert Shomer, who criticized several of the techniques the interrogating officers had used
to stimulate Scott’s memory and testified that the use of these techniques could result in memory
creation.
The study of interrogation techniques and false confessions has been recognized by
some courts as scientifically legitimate, and these courts have, to varying degrees, admitted expert
testimony on this subject. See, e.g., United States v. Hall, 974 F. Supp. 1198, 1205 (C.D. Ill. 1997)
(admitting testimony by Leo’s colleague, Richard Ofshe); Franks v. State, 90 S.W.3d 771, 805 (Tex.
App.—Fort Worth 2002), pet. ref’d, untimely filed, 97 S.W.3d 584 (Tex. Crim. App. 2003)
(discussing Leo’s trial testimony). But see Ruckman v. State, 109 S.W.3d 524, 530 (Tex.
App.—Tyler 2000, no pet.) (holding that defendant did not meet burden of showing scientific
reliability of proffered testimony). In this cause, the trial court effectively recognized the legitimacy
of this field of social scientific study by ruling that most of Leo’s proffered testimony was
admissible. The narrow question before us is whether the trial court abused its discretion by
excluding Leo’s proffered testimony regarding the categories of false confessions, and particularly
persuaded false confessions. 
The trial court was the sole judge of the weight and credibility of the evidence
presented at the “gatekeeper” hearing. Kelly, 824 S.W.2d at 574. Our review of the record
persuades us that the court’s decision to admit most, but not all, of Leo’s proffered testimony, and
particularly the court’s decision to exclude the proffered testimony regarding persuaded false
confessions, was within the “zone of reasonable disagreement.” Montgomery v. State, 810 S.W.2d
391 (Tex. Crim. App. 1991) (op. on reh’g); see Kelly, 824 S.W.2d at 574. On this record, we cannot
state that the court abused its discretion by concluding that Scott failed to demonstrate by clear and
convincing evidence that the excluded testimony was reliable and would assist the trier of fact to
determine a fact in issue. Point of error nine is overruled.
 
Conclusion
The evidence is legally and factually sufficient to sustain the jury’s verdict. The
admission of Springsteen’s testimonial statement to the police violated Scott’s Sixth Amendment
confrontation right, but the error was harmless beyond a reasonable doubt. No other error is
presented. We affirm the judgment of conviction.
 
 
                                                __________________________________________
                                                David Puryear, Justice
Before Chief Justice Law, Justices Patterson and Puryear: Opinion by Justice Puryear;
     Dissenting Opinion by Chief Justice Law
Affirmed
Filed: March 24, 2005
Publish
 

Appendix

District Court’s Findings of Fact and Conclusions of Law 
Regarding Admissibility of Scott’s Statements to the Police


Findings of Fact
 
1.    Michael Scott was questioned by Austin police officers several times from September 9, 1999
through September 21, 1999; specifically on September 9, September 10, September 12,
September 13, September 14, September 17, September 19 and September 21.
 
2.    The methods used to preserve these conversations and interrogations varied — some were
unrecorded, some videotaped, some audiotaped, and one written out and signed by Scott.
 
3.    The defendant was not placed under arrest on any of these occasions, nor was he frisked or
handcuffed.
 
4.    The defendant was not physically forced in any way to accompany the officers on any of the
aforementioned dates.
 
5.    On each occasion, the defendant was allowed to leave and return home at the close of the day’s
interview.
 
6.    The defendant was allowed smoke breaks on his own and was free to come and go throughout
the interviews without being guarded by police officers.
 
7.    On some occasions the defendant accompanied the officers out to lunch at restaurants during
the day’s questioning.
 
8.    During the interview of September 9 the defendant mentioned his possible need of a lawyer and
discussed this with the officers [citation to transcript of interview]. The defendant never made
an unequivocal request for counsel and continued with the interview.
 
9.    During the September 10 interview, Officer Merrill possessed a handgun in the interview room
with Scott present. The weapon was unloaded and was handled by both Merrill and the
defendant. Merrill had the weapon in his hand, but not pointed at the defendant, when he
pointed a finger at defendant’s head from the rear. The weapon was not used in a threatening
manner, and there is no evidence that it coerced or terrorized the defendant or led him to make
statements or submit to further questioning against his will. He had, in fact, made many
inculpatory admissions prior to this incident. Scott orally stated that he was cooperating with
officers voluntarily, and in fact returned on several subsequent occasions to confer with officers.
 
10.  On September 10 & 12 when officers went to pick the defendant up, he was waiting on the side
of the main road some ½ mile from his home, and the officers stopped at a convenience store
so the defendant could make purchases.
 
11.  On September 13 the defendant agreed to talk with officers at his home. When the officers’
recorder malfunctioned, Scott attempted to assist them by providing batteries.
 
12.   On September 13 & 14 Scott told officers he had spoken with attorney Betty Blackwell for
advice but didn’t need an attorney and would continue cooperating with officers.
 
13.  On September 14, Scott met officers at Grandy’s restaurant as planned and accompanied them
to police offices. For the first time he was read Miranda rights, and a written statement was
taken.
 
14.  There is no evidence that the defendant was tricked, coerced, threatened, mistreated,
brainwashed, hypnotized or deceived, either during taped interviews, or in unrecorded
conversations with police officers.
 
15.  The defendant had the mental capacity to understand his situation and to choose to participate
in the interviews conducted in September, 1999 of his own free will.


Conclusions of Law
 
  1.   The defendant, Michael Scott, was not in custody at any time during the interviews conducted
throughout September of 1999. A custody determination depends entirely upon the objective
circumstances of the interrogation. A person is in custody only if, under the circumstances, a
reasonable person would believe his freedom of movement was restrained to the degree
associated with a formal arrest. Stansbury v. California, 244 S. Ct. 1526 (1994); Dowthitt v.
State, 931 S.W.2d 244 (Tex. Crim. App. 1996); Stahle v. State, 970 S.W.2d 682 (Tex.
App.—Dallas 1998 [pet. ref’d]). Based on the facts outlined above, no reasonable person could
believe he was under arrest during any of the several interviews conducted with the defendant
in September, 1999.
 
  2.   Because the defendant was not in custody, there was no violation of Miranda v. Arizona or
[Tex. Code Crim. Proc. Ann.] Article 38.22 when officers failed to read the defendant his rights
prior to or during the interviews. When a person is not in custody and is free to terminate the
interview and leave at any point, and a reasonable person in that situation would understand his
status, then the aforementioned warnings are clearly not required by law. Miranda v. Arizona,
86 S. Ct. 1608 (1966); Stansbury; Dowthitt; Stahle; Nenno v. State, 970 S.W.2d 549 (Tex. Crim.
App. 1998).
 
  3.   The defendant did not make any request for counsel which triggered a constitutional right to
confer with counsel before continued questioning by officers. The September 9th discussion
concerning counsel was not an unequivocal request for counsel. It certainly could not be
described as clear and unambiguous. Under these circumstances officers were not required to
cease questioning until the defendant had an opportunity to talk with counsel. This would have
been true even if Scott had been in custody. Davis v. United States, 114 S. Ct. 2350 (1994);
Dinkins v. State, 894 S.W.2d 330 (Tex. Crim. App. 1995). In a decision where the suspect-police officer discussion was strikingly similar to the case at bar, the San Antonio court of
Appeals reversed itself in light of Davis and ruled that there was no violation of the defendant’s
right to counsel. State v. Panetti, 891 S.W.2d 281 (Tex. App.—San Antonio 1994 [pet. ref’d]).

“When reviewing alleged invocation of the right to counsel, we typically look at the
totality of the circumstances surrounding the interrogation, as well as the alleged
invocation . . . .” Dinkins, at 351.
 
Scott was at the interview of his own free will; he was free to leave at any time for whatever
reason. He continued freely with the interview; he returned on many subsequent occasions; he
later consulted with counsel and then continued with interviews. Given the ambiguous nature
of the discussion concerning counsel, and after reviewing the totality of the circumstances, no
violation of the defendant’s right to counsel or right to remain silent occurred.
 
  4.   The defendant’s 6th Amendment right to counsel had not attached at the time the challenged
statements were made. The right to counsel under this constitutional provision becomes
effective at the initiation of adversarial proceedings, whether by way of indictment, formal
charge, preliminary hearing, or arraignment. Brewer v. Williams, 97 S. Ct. 1232 (1977); Moran
v. Burbine, 106 S. Ct. 1135 (1986).
 
  5.   Under the totality of the circumstances, the defendant made a free and rational choice to speak. 
Neither specific incidents of police conduct, nor police conduct taken as a whole, rendered
defendant’s statements involuntary. No violation of due process or state or federal
constitutional or statutory law occurred during defendant’s questioning by police. See Nenno
at 557-559, and cases cited therein.